# WILSON et al. v. RENTIE et al.

No. 17665—Opinion Filed Dec. 7, 1926.

Rehearing Denied March 8, 1927.

## 1. Fraud—Confidential Relation—Existence —General Rule Stated.

Confidential relation exists between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party, and includes legal and all other relationships where confidence is rightfully reposed.

## 2. Fraud—Evidence—Admissibility.

In determining the existence of fraud, any evidence, direct or circumstantial, which is competent by other rules of law, and has a tendency to prove or disprove such issue, is admissible. The whole transaction involving the alleged fraud may be given in evidence. Hankins v. Farmers' & Merchants' Bank, 42 Okla. 330, 141 Pac. 272.

## 3. Fraud—Gist of Fraudulent Misrepresentation Producing False Impression.

The gist of a fraudulent misrepresentation is the producing of a false impression upon the mind of the other party, and if this result is actually accomplished, the means of accomplishing it are immaterial.

## 4. Disposition of Cause.

The judgment is sustained under the equity rule as to quantum of evidence.

(Syllabus by Estes, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Okfuskee County; John L. Norman, Judge.

Action by Katie Rentie et al. against C. W. Wilson et al. From a judgment for plaintiffs, defendants appeal. Affirmed.

E. T. Noble and S. L. O'Bannon. for plaintiffs in error.

Tom Hazlewood, S. H. Davis, and J. W. Thompson, for defendants in error.

Opinion by ESTES, C. Parties will be referred to as they appeared in the trial court, inverse to their order here. Plaintiffs sued defendants to reform a so-called royalty deed conveying all their one-eighth royalty interest of minerals in 80 acres of land on the ground that it was their intention to convey only an undivided one-half of such interest, alleging that such deed as to such overplus of interest in the royalty was obtained from them by conspiracy on the part of the three defendants thus to cheat and defraud. At the time the action was brought defendants had conveyed to innocent third persons eleven-sixteenths of their rights in the land, and thus held only five-sixteenths thereof. In a second cause of action, plaintiffs sought damages for the value of oil and gas sold by defendants out of the royalty; and in a third cause, sought one-half of the one-eighth royalty yet remaining in the hands of the defendants. The cause was tried to an advisory jury which, in response to interrogatories, answered that plaintiffs, at the time of the execution and delivery of the deed in controversy, intended to convey only an undivided one-half of their interest and that their entire interest was of the reasonable market value of $250 per acre, that is, $20,000 for the 80. Defendant Wilson had paid $10,000 for the entire royalty of the 80 at the rate of $125 per acre. Thereupon the court adopted such findings of the jury and found in favor of plaintiffs, adjudging them to be the owners of an undivided five-sixteenths interest, being all the interest at that time held by de-

fendants, rendering judgment against defendants for three-sixteenths interest, which defendants had sold to innocent third persons over and above the eight-sixteenths which they had in fact purchased; and also rendering judgment against defendants for their aliquot part of the royalty money impounded in the hands of the Texas Company and belonging to plaintiffs as so found and adjudged. From this judgment, defendants have appealed. It is conceded that the judgment is correct as to the second and third causes of action if plaintiffs are entitled to the equitable relief of reformation sought in their first cause. The only question presented is whether the judgment under the first cause is supported by the sufficient quantum of evidence under the law.

Katie Rentie and her husband, Morris Rentie. negroes, about 77 years of age, occupied as a homestead a quarter section of land, the freedman allotment of, and owned by, said Katie, under an oil and gas lease to the Texas Company. In 1925 an oil well was brought in on the adjoining land on the east, causing excitement. Very numerous persons were calling upon the old folk proposing to buy their royalty interest in their land. Among others, on March 25th or 26th, defendants Cary and Courter came to the premises and opened negotiations with Jim and Dan Rentie, sons of plaintiffs, for all the royalty in part of the land for $250 per acre and agreed to pay each of said sons $500 as commission in making the deal with their parents. Plaintiffs testified that on the following day, Thursday, defendant Wilson called upon them, saying. "All the people you see up and down the road are robbers and thieves and will rob you, and if you take a notion to sell it, come to Okmulgee Friday or Saturday." Plaintiffs told Wilson that two strangers—meaning Cary and Courter—had made an offer, and Wilson said they were robbers and that he would not stand to see the old people robbed; that plaintiffs might get their land tangled up and couldn't get justice in court and for them to go with him in his car to Okmulgee and he would see that they were not robbed. They were so taken, but it was too late to close any business that evening. The following morning, Friday, said son Dan and Mr. Wilson, in the latter's office, procured the signature of Katie to a deed for an undivided three-fourths interest in the southeast 40 of the quarter, being equal to 30 acres, for $7,500, or at the rate of $250 per acre, Cary and Courter being grantees. Wilson delivered to Katie also this receipt of same date signed by him: "Received of Katie Rentie one mineral lease

or deed to be put in escrow in the Citizens' Bank with surtified Ck. for $7,500." Up to this point there is no controversy as to the facts, except that Wilson testified that he had told the old folk only that if they would go with him he would help them make the sale and see that they got a fair deal. It was agreed that plaintiffs should return to Wilson's office in the morning of the next day, Saturday. Nothing further was done to perfect the sale between plaintiffs and Cary and Courter, it not appearing what became of this royalty deed, though an unsigned copy is in evidence. Cary and Courter testified that they refused to complete this transaction because they were unable to get also an interest in the 40 acres south of the land of plaintiffs, Wilson telling plaintiffs they could not command the money. Dan Rentie testified that on Saturday morning in the office of Mr. Wilson, his mother, Katie, said to Mr. Cary. "I want some money coming"; that Cary smiled and said she would get her money, and then Mr. Wilson came in from an adjoining office with another deed, and Cary said that Mr. Wilson was paying. This was the first information to plaintiffs that Wilson was to be the purchaser, although there had been talk that they, Cary and Courter, wanted to buy $10,000 worth of the royalty, instead of $7,500. Cary and Courter testified that they abandoned their deal on Saturday morning. Wilson testified that Cary and Courter abandoned their deal on Friday evening, because they demanded an abstract and he insisted on their paying and closing the deal then without an abstract, notwithstanding his giving plaintiffs the escrow receipt, supra, on Friday evening. The other deed presented to plaintiffs on Saturday morning by Wilson in his office is the one in controversy. It conveys "an undivided all interest in all of the oil, gas, coal and other minerals" in or under the east 80 acres of plaintiffs' quarter section, to defendant C. W. Wilson for $10,000, being thus at the rate of $125 per acre. All of the witnesses agreed that this deed was not read to the plaintiffs. Defendants testified that Wilson told plaintiffs he, Wilson, was purchasing the entire interest and this was denied by plaintiffs and others present at the time. Plaintiffs testified that they understood at the time that they were conveying only the undivided one-half of their said one-eighth in the 80 acres, conceding the deed valid thus in part. Wilson admits that he settled the commission with Dan and Jim Rentie by paying them $200 each, because Cary and Courter had agreed to pay commission. It is undisputed that

Jim Rentie read this deed only to himself and told his parents, in substance. that it was all right. Therefore the statement of Jim Rentie made to plaintiffs that the deed was all right, without reading same to plaintiffs, became the act of the defendants, whose agent Jim Rentie was. Whereupon plaintiffs executed and delivered the deed to Wilson, who then paid them $10,000. Three days thereafter, Wilson conveyed by separate instruments an undivided interest therein equal to 30 acres—the quantum they had been negotiating for—to defendants Cary and Courter at $125 per acre, and they in turn soon conveyed a part of their respective interests to other and innocent third persons. receiving more than $250 per acre for part thereof. The evidence is preponderating that the royalty interest in this land at the time was of the value of $250 per acre.

1. Wilson admits that he had been an advisor to, and transacted business with, plaintiffs for many years. Plaintiffs testified that Wilson had been their legal and business advisor for some 20 years, though it does not appear that he was an attorney; that they had all confidence in him and never thought of getting any one to read the Wilson deed. Wilson testified that he worked from Wednesday to Saturday trying to complete the deal with Cary and Courter. Plaintiffs were not only elderly, but quite illiterate—Katie could read some, and Morris not at all, although each could write his name. Under this record. confidential relation existed between plaintiffs and defendant Wilson. This is any relation existing between parties wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party, and includes legal and all other relationships where confidence is rightfully reposed. 12 C. J. 421, 1924 Annot. 312; Ewing et ux. v. Ewing, 33 Okla. 414, 126 Pac. 811. It might be said, as in the Ewing Case, that Wilson acquired title to the one-half interest by fraud and was trustee ex maleficio of a constructive trust as to such one-half. Under his own admission of his intention to protect plaintiffs, whereby he induced them to come to his office, Wilson was bound to act with the utmost good faith for the benefit of plaintiffs. This included any transaction with himself. It is well settled that when this relation appeared, the burden devolved upon Wilson to show that his personal transaction with them was fair and free from fraud.

2, 3. In determining the existence of fraud, any evidence, direct or circumstantial, which is competent by other rules of law, and has a tendency to prove or disapprove such issue. is admissible. The whole transaction involving the alleged fraud may be given in evidence. Hankins v. Farmers' & Merchants' Bank, 42 Okla. 330, 141 Pac. 272. While plaintiffs state their cause of action is one for conspiracy to cheat and defraud. the gist of their action is fraud. The gist of fraudulent misrepresentation is the producing of a false impression upon the mind of another party, and if this result is actually accomplished, the means of accomplishing it is immaterial. International News Service Co. v. News Pub. Co. et al., 118 Okla. 113, 247 Pac. 87.

We do not deem it necessary further to review the record on the question of fraud. Numerous reasonable inferences might be suggested. arising from facts and other circumstances of this record, strongly tending to show that defendants produced a false impression upon the minds of plaintiffs— that they were conveying an undivided one-half interest in their royalty instead of the whole thereof. It was not suggested to them in any of the negotiations that the price of their royalty was other than $250 per acre for the entire interest. Likewise, we think the facts and circumstances and reasonable inferences therefrom show concerted fraud on the part of defendants. Under the equity rule as to quantum of evidence, let the judgment be affirmed.

By the Court: It is so ordered.

Note.—See under (1) 12 C. J. p. 421; 12 R. C. L. p. 233. (2) 27 C J. pp. 50, 51, §181. 12 R. C. L. p. 429; 2 R. C. L. Supp. p. 1427; 4 R. C. L. Supp. p. 758; 6 R. C. L. Supp. p. 707. (3) 26 C. J. p. 1066, §8. (4) 34 Cyc. p. 984.