## STEINER v. HUGHES.

No. 25051. March 26, 1935.

Rehearing Denied May 14, 1935.

T. D. Evans, for plaintiff in error.

Stanley D. Campbell, for defendant in error.

PER CURIAM. This was an action by plaintiff (plaintiff in error here), O. A. Steiner, against defendant (defendant in error here), Seth Hughes, to recover as damages the amount of $480, to be credited with $150 down payment, with 6 per cent. interest from April 13, 1932, for alleged breach of contract by the defendant to purchase 30 shares of 6 per cent. prior lien stock of the Public Service Company of Oklahoma, at $50 per share. The petition alleged that on the 5th day of April, 1932, the defendant, Seth Hughes, orally agreed with plaintiff to buy 30 shares of said stock, at $50 per share net, or a total of $1,500; that at the time of said contract, the defendant paid plaintiff, as a down payment on the purchase price, the sum of $150. Defendant filed an answer admitting the breach by his refusal to take the stock when tendered him, and by way of cross-petition asked for the return of the $150 down payment made by him at the time the contract was entered into. For justification of his breach of contract, defendant pleaded that he had been induced to enter into said contract through fraudulent misrepresentations on the part of the plaintiff, or his agent, O. A. Steiner, Jr.; such charge of fraud being contained in the following allegation:

"That on the 5th day of April, 1932, he received a telephone call from O. A. Steiner, Jr., the secretary and agent of O. A. Steiner & Company (which it is alleged in the petition was a trade name only; said business being owned and conducted by O. A. Steiner), at which time inquiry was made of defendant, if he was in the market for certain industrial shares of stock hereafter mentioned; that defendant informed said O. A. Steiner, Jr., it would depend entirely upon the price that said Steiner was paying for said stock as well as the profit being made per share thereon; that said Steiner thereupon stated that said stock was being handled by him at a profit of 75 cents per share. In other words, said Steiner represented to the defendant that said stock was costing O. A. Steiner & Company $49.25 per share and defendant says that, said O. A. Steiner, Jr., then and there, with the intent to deceive and defraud the defendant as an inducement for the defendant to purchase said shares, fraudulently represented the cost thereof to be as above stated; that the defendant believed the statement so made to be true, and thereupon agreed to purchase 30 shares of Public Service Company of Oklahoma six per cent. prior lien stock at the price of fifty (50) dollars per share and paid on account thereof the sum of $150."

Defendant further alleged that after the contract was entered into, but before the stock was delivered to him, he learned from one P. A. McNeal that the stock was costing the plaintiff $40 per share, and that plaintiff had, after the contract in controversy, sold some of the same block of shares to the said McNeal at $41 per share. Defendant alleges that he was induced to enter into said contract by reason of the fraudulent statement concerning the cost of the stock to the plaintiff; and that, but for such representation, he would not have entered into the contract, agreeing to pay $50 per share for the purhase of same. Defendant therefore denies liability for breach of his contract to pay for the stock tendered at the agreed price; and, upon the

same ground, by cross-petition, asks for return of the $150 which he paid at the time of execution of the contract.

The case was tried to a jury, and the jury returned a verdict in favor of defendant, upon plaintiff's petition, and also in favor of defendant, against plaintiff, upon the cross-petition.

The appeal taken by plaintiff from such verdicts and judgment thereon is based upon two primary propositions:

"(1) The sufficiency of the evidence offered by defendant to support his charge of fraud or misrepresentation entering into the execution of the contract.

"(2) Error in the instructions of the trial court."

1. By demurrer to defendant's evidence upon his cross-petition, and by motion for directed verdict in favor of plaintiff at the conclusion of the testimony, plaintiff properly raised the question as to the sufficiency of the evidence to support the allegation of fraud in the procurement of the contract. The jury found the issues presented in favor of the defendant; and, under familiar holdings, if there was any evidence, or any reasonable inferences to be drawn therefrom, tending to support the contention of the defendant, the controversy is concluded by the verdict of the jury.

As we view this evidence, however, and the law regarding the duties of a vendor, there is not even a scintilla of testimony tending to support the allegation of fraud upon which defendant relied. The defendant himself testified that he had lived in Tulsa since 1909, and was engaged in the real estate business; that he had at various times bought and sold stocks, including stocks of the Public Service Company of Oklahoma. With respect to this particular transaction, he testified that, about April 5, 1932, he (the defendant) by telephone, called Archie Steiner, son and admitted agent of O. A. Steiner, the plaintiff herein, and "Told him that some other brokers had called me and told me they could get some Public Service stock for me at a pretty reasonable price, and as I had business with them (Steiner) before, I wanted to know what they could do on Public Service stock, and he said, 'Well, I will come right over and talk to you about it.' He said, 'I don't know right now what I can get it for, but I will come over and see'". He then testified that about 1:30 of that day, Archie Steiner

came to his office; and he related the transaction in the following language:

"A. He said he had a wire from Chicago; that there was a lot of uncertainty in Chicago due to some Insull trouble and he had a wire from Chicago where he could buy some Public Service Company stock. He could sell it to me at a price of $50 a share, but he could only get it at that price if he would take 50 shares. He could sell it at $50 a share. He said it was a firm offer from Chicago of 50 shares and he could sell it to me at $50 a share. I didn't know what the firm offer meant. I said 'What will that cost you?' and he said 'About $49.25 a share' and I said 'That leaves you only a profit of 75 cents, does it not?' and he said 'Yes. That is right.' I said 'That seems to be a small profit in my estimation on a transaction of this kind,' and he said, 'We are not doing very much business and whatever we pick up is all right,' and I said 'Archie, I cannot buy 50 shares of this stock. I can only handle 30 shares' and he said 'I believe I can dispose of the other 20 shares, but I will have to let you know,' and that was about all the conversation that took place at that time. That was about 1:30 of April 5th. Q. When did you next see him to talk to him? A. He next came back to my office. Q. About how long after that? A. I imagine about 3:30 in the afternoon. Second visit to my office, and he stated he had been able to dispose of the other 20 shares and could deliver me 30 shares, and he had with him a confirmation. A letter signed by his father. Said 'We confirm to you a sale of 30 shares Public Service Company prior lien stock at the price of $50,' and in the letter it states the total price would be $1,500, on which they had received $150 and the balance due of $1,350 and that I would get delivery of the stock in about ten days and he said it was their custom to collect a deposit on the stock of $5 per share, so I wrote him out a check for $150 and gave him the check and he gave me the confirmation of the stock and that was the deal. * * * Q. When you gave him the check in the later visit to your office on that day, as he left the room, was there anything said regarding the profit they would make on it at that time? A. No, sir. We talked about the situation there in Chicago where he said the bankers were dumping the stock on the market. I said 'This stock will come to me on a draft from Chicago, will it not?' and he said 'Yes, it will.' I said 'That draft will show the cost to you, will it not?' and he said 'It will.' Q. Did you have any knowledge other than what he told you of what the stock would cost him to get it for you? A. No, sir. Q. Did you believe and rely on his statement? A. I did. Q. Was that an inducement to your purchasing the stock?

A. Yes, sir. Q. Is that about all there is that happened in connection with making the deal? A. Yes, sir."

This is the gist of the testimony of defendant on the point of fraud.

The testimony develops that within 10 days from April 5, 1932, admittedly a reasonable time, plaintiff tendered 30 shares of said stock, in accordance with the agreement, to the defendant; but the defendant, having learned through one McNeal that the plaintiff had not paid $49.25 per share for the stock, but some lower figure,— which the proof might indicate was $40 a share, but which plaintiff's exhibits 1 and 2 indicate was sold to plaintiff by Chicago people at $46 per share—refused to go through with the contract and pay the remaining amount of $1,350. The undisputed testimony is, that plaintiff tried to sell the stock, upon such breach, to other parties, at the highest market price, but the market subsequently fell, and the best price he was able to procure for it was $34 per share.

Is there sufficient evidence of material misrepresentation, or fraud, in these facts to justify a court in submitting to a jury the question of defendant's liability? Defendant briefs this case upon the theory that plaintiff occupied a confidential relation of broker to defendant. This contention is not well taken, for the reason that no such theory was advanced, nor was any issue of agency made in the trial court; and parties will not be permitted, upon appeal to this court, to prevail on issues not raised in the trial court. Baldwin and Baker v. Saunders-Gibson Co., Inc., 148 Okla. 290, 298 P. 600; Samuels v. Granite Savings Bank & Trust Co., 150 Okla. 174, 1 P. (2d) 145; Black v. Parisho, 152 Okla. 70, 3 P. (2d) 673. The burden of proving the existence of a confidential relation is on the party asserting it. Furrow v. First National Bank, 133 Okla. 137, 271 P. 632; 27 C. J. 46. There being no such issue raised, it cannot now be asserted that plaintiff was acting as defendant's agent, or broker. Plaintiff was a general broker in stocks and bonds, but this transaction discloses on its face that it was a sale and purchase of the stock; and plaintiff would have been bound to respond in damages for failure to deliver the stock at the time agreed, whether plaintiff had been forced to pay more or less than the $50 per share. King v. Coombs, 36 Okla. 396, 122 P. 181.

The parties here dealt at arm's length. The defendant was an experienced real es-

tate man and had dealt in stocks; and on the very morning in question had called other dealers to ascertain what was the market price of this particular stock; and, although the evidence does not disclose the quotations of other dealers to him, manifestly, he had fully informed himself before he approached plaintiff's agent, as to the value of the stock on the 5th of April, 1932. He does not testify that he advised Archie Steiner, Jr., he would not purchase the stock if plaintiff was making a profit of more than 75c a share on the deal, but merely that he asked what profit plaintiff was making; and upon being advised that it was 75c per share, told Steiner that it "seemed to him this was a small commission."

There is much testimony in the record, but the foregoing contains the substance of the evidence relied upon by defendant to support his claim of fraud. There is further evidence that the stock declined in value rapidly immediately after the 5th of April, for about two or three weeks. Under the circumstances disclosed in this case, we regard the statements made by plaintiff's agent, as to the cost to him of the stock, as pure "dealers's talk"; and do not feel there was sufficient materiality, or proof of reliance upon them, to justify the court in submitting the case to the jury. In so holding, we are fully aware of prior decisions of this court, commencing with Prescott v. Brown, 30 Okla. 428, 120 P. 991, to the effect that in this state the rule of caveat emptor has been so far relaxed as to prevent its being used as a "shield and protection to the deliberate frauds and cheats of sharpers." This opinion has been consistently followed by this court. See Chisum v. Huggins et al., 55 Okla. 423, 154 P. 1146; Rogers v. Brummet, 92 Okla. 216, 220 P. 362; Viking Refrigerators, Inc., v. McMeachin, 145 Okla. 76, 291 P. 521.

But we have found no case, by this court, in which the contended fraud consisted merely of a statement made by the seller, upon inquiry by the purchaser, that the property was costing, or had cost him— the seller—more than it actually cost, where this court has held that such a statement, unless coupled with other elements of fraud, inequality of the parties, overreaching or confidential relations, has been held to constitute actionable misrepresentation. Holding, as we do, that this was a transaction of sale, and the parties dealt at arm's length, the most that can be said for the representations made by the plaintiff is that they

were dealer's talk, similar to statement of value, or opinion, concerning which the defendant was in no wise misled, and from which no loss was caused to the defendant, because the stock which was tendered to defendant was the identical stock which he had agreed to purchase, and at the price which he had agreed to pay. We regard the representations made by plaintiff as no more actionable than those which might be made by any merchant in the sale of goods; and the facts do not disclose that these statements were in any wise material in causing the defendant to be misled, or in causing him to purchase property that was of a different kind, or value, than the property he thought he was purchasing. Even under the relaxed rule in this state, caveat emptor still applies to such statements, particularly where the identical thing promised is delivered at the price agreed, and the parties are dealing at arm's length.

In Campbell v. Newton & Driskill et al., 52 Okla. 518, 152 P. 841, this court held:

"In the purchase of property, the mere fact that it was sold too high is not per se prima facie evidence of fraud in the consummation of the said sale."

In the body of the opinion, the court said:

"The principal defense advanced by defendants was that of fraud, and the only competent evidence pertaining to fraud is the testimony of defendant J. A. Newton to the effect that the colts were sold at too high a price. This kind of evidence, standing alone and unsupported by evidence of other wrong conduct, does not make out such a case of fraud as justifies its submission to the jury. In other words, that the property was sold at an exorbitant price is not per se any indication whatever of fraud, and there is no competent testimony in this case, other than the statement of defendant, J. A. Newton, even that the colts were sold at an exorbitant price. It is well known that racing colts at that age have only a speculative value, and their real value depends almost wholly upon their showing after development and training. In the case at bar, the colts were shown to have a thoroughbred pedigree, and, while they only brought about $1,600 at the auction sale, there was evidence introduced at the trial showing that one of these colts was then worth between $1,500 and $2,000, and another between $1,000 and $1,200, and one of the same was a full brother to a horse that had been sold for $8,000.

"Fraud is never presumed, but must be proven by the party pleading the same, and in this case defendants have signally failed to prove facts that raise even a suspicion of fraud."

—and the court reversed a judgment upon verdict of the jury, because of lack of testimony of fraud.

In the case of Wyrick v. Campbell, 67 Okla. 240, 170 P. 267, it was held:

"The general rule is that fraud cannot be predicated on representations as to value, for the reason that such representations are generally regarded as mere opinions, or seller's statements, and in law do not constitute fraud. This is true, though they may operate to defeat an action for specific performance. This rule is based on the fact that value is largely a matter of judgment and estimation about which reasonable and honest men may differ. Where the parties stand on an equal footing, have equal means of knowledge, and there is no relation of trust and confidence existing between them, fraud cannot be predicated on representations of value."

Under such facts this court held a demurrer to plaintiff's evidence should have been sustained.

In the case of Nowka v. West, 77 Okla. 24, 186 P. 220, the following language is quoted, with approval, from 39 Cyc. 1285:

"Where there is an inspection, or an opportunity for inspection, by the purchaser, the doctrine of caveat emptor applies notwithstanding a false statement by the vendor as to the value of the realty contracted for, unless the purchaser lives at a distance from the realty, or is prevented by fraud on the part of the vendor from making the examination, or the conditions are such as to render an examination impossible, or a relation of trust and confidence exists between the parties."

In Furrow v. First National Bank, 133 Okla. 137, 271 P. 632, it was held that an allegation by plaintiff of misrepresentation by defendants, both as to value of property sold to plaintiff and as to the amount paid therefor by defendants, was not sufficient as a matter of law to entitle plaintiff to go to the jury on the question of fraud.

The effect of the testimony in this case is to bring it squarely within the principle announced in those opinions. Stocks are highly speculative. The testimony was that this stock fell in value immediately after the contract, but there is no testimony it was not worth the price paid for it on the day of the sale. To permit parties to avoid the obligations of their solemn contract upon testimony that the profit the vendor was making had been misrepresented to them, would unnecessarily hamper the ordinary routine of business. This court announced

272

the true distinction to be observed in Rogers v. Brummet, 92 Okla. 216, 220 P. 362, where it was held:

"Mere statements as to the value of property, though untrue, standing alone, made to a prospective purchaser, do not constitute actionable fraud unless other false and fraudulent statements, or wrongful acts, follow, which are calculated to, and would ordinarily mislead a purchaser in the exercise of that degree of care that an ordinarily prudent person would use in his own business affairs. * * * There is quite a difference between mere statements of opinion as to the value of property, made to a purchaser, who is left free to follow up the usual opportunities for investigation, and where the vendor takes steps to safeguard and prevent the purchaser from making inquiries among people who are familiar with the property and its value."

There are many opinions by this court affirming verdicts of juries on the ground of fraud, some of which are: Berry v. Stevens, 168 Okla. 124, 31 P. (2d) 950; Martinson v. Hamil, 132 Okla. 70, 269 P. 255; Morris v. McLendon, 167 Okla. 68, 27 P. (2d) 811; Dozier v. Northrop, 89 Okla. 67, 213 P. 304; O'Quinn v. Northaff, 85 Okla. 215, 205 P. 498; Chisum v. Huggins, 55 Okla. 423, 154 P. 1146; Wilson v. Rentee, 124 Okla. 37, 254 P. 64; but in no instance has the fraud proven consisted merely of a statement as to value or cost or profit alone, and we are unwilling to extend the rule of fraud to cover such instances. See 12 Ruling Case Law, p. 381, sec. 132; Robinson v. Phegley (Ore.) 163 P. 1166; Hawk v. Brownell (Ill.) 11 N. E. 416; Beare v. Wright, 14 N. D. 26, 103 N. W. 632, 69 L. R. A. 409.

It follows from what we have said that the judgment of the trial court should be reversed, with instructions to that court to deny the cross-petition of defendant and render judgment upon the evidence in favor of plaintiff for the difference between the amount at which the plaintiff was forced to sell the 30 shares and the amount agreed to be paid by the defendant, or $1,500. In view of our determination of this question, it is not necessary to consider instructions given by the trial court.

Cause reversed and remanded for proceedings in conformity herewith.

The Supreme Court acknowledges the aid of Attorneys M. K. Cruce, Harris L. Danner, and R. L. Disney in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Cruce and approved by Mr. Danner and Mr. Disney, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration, this opinion was adopted.

McNEILL, C. J., and RILEY, PHELPS, CORN, and GIBSON, JJ., concur.